UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| TIMOTHY NEAL MARTIN | * | CIVIL ACTION NO. 20-1610 |
| | * | |
| VERSUS | * | SECTION: "D"(1) |
| | * | |
| KILOLO KIJAKAZI, COMMISSIONER | * | JUDGE SUSIE MORGAN |
| OF THE SOCIAL SECURITY | * | |
| ADMINISTRATION | * | MAGISTRATE JUDGE |
| | * | JANIS VAN MEERVELD |
| *********************************** | * | |

REPORT AND RECOMMENDATION

The plaintiff, Timothy Neal Martin, seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claim for disability insurance benefits ("DIB") under Title II the Act, 42 U.S.C. § 423. The matter has been fully briefed on cross-motions for summary judgment. For the following reasons, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 19) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 25) be GRANTED.

**Procedural Background**

Mr. Martin applied for DIB on October 5, 2017, asserting a disability onset date of September 1, 2005. He alleged the following illnesses, injuries, or conditions: left leg artificial revised knee, 11 knee surgeries; left leg no calf muscle, removed and used as extra skin; Hepatitis C Non-Alcoholic Cirrhosis, must check every 6 months for liver cyst; cannot engage in landscaping anymore because of a fear of getting bacteria in his knee; and arthritis in his right knee. On March 21, 2018, his claim was denied by the state agency. The Disability Determination Explanations concluded that although he was "having problems with [his] left knee and calf muscle, hepatitis c, and arthritis of the right knee there is insufficient evidence to properly assess

1

your case or determine if you were disabled prior to your date last insured of 12/31/2010." R. at 70.

Mr. Martin obtained counsel and requested a hearing before an Administrative Law Judge ("ALJ"), which was held on February 26, 2019. On March 27, 2019, the ALJ issued an adverse decision. Mr. Martin timely appealed to the Appeals Council, which denied review on March 30, 2020.

On June 3, 2020, Mr. Martin filed a Complaint in federal court to review the Commissioner's decision. (Rec. Doc. 1). The Commissioner answered and filed the administrative record on December 16, 2020. (Rec. Docs. 12, 13). The parties filed cross-motions for summary judgment. (Rec. Docs. 19, 25). Mr. Martin is represented by counsel.

## **Evidence in the Record**

*Testimony and Forms*

In conjunction with his application for disability benefits, Mr. Martin submitted a Work History Report regarding his previous 15 years of work. R. at 147. He listed his past work as horticulturalist from 1992-2007, landscape contractor from 2007-2008, and landscaping sales (part time) from 2009 through 2012. R. at 148. He reported that as a horticulturalist, he sold, designed, and installed landscape projects and also did lawn maintenance. R. at 150. He would work 16 hour days, 6 days a week and would stand, walk, and stoop the entire time. Id. He would lift 100 pounds or more. Id. He reported that he would lift 25 pounds regularly. Id. He supervised 12-15 people. Id. He reported that as a landscape contractor, he performed the same duties as the last job, only the jobs were bigger and he would supervise 13-18 people. R. at 151. He reported that when working in landscaping sales he would get paid on commission. R. at 152. He explained that as his knee got worse he could not work in the field anymore so he would sell jobs for the company

2

but the pay was never steady. R. at 152. He would lift a maximum of 20 pounds and would mostly "push paper." Id.

Mr. Martin testified before the ALJ on February 26, 2019. R. at 22. At that time, he amended his alleged disability onset date from September 1, 2005, to September 8, 2008. R. at 30.

Mr. Martin was 57 years old at the time of the hearing. R. at 32. He testified that he studied at Louisiana State University, then joined the Marine Corps and went on two tours, and then went to night school at Loyola. R. at 33. Although he obtained a bachelor's degree, he decided to work as a landscaper and horticulturalist because it fit his personality better and because it is his passion. Id. He explained that a landscaper and horticulturalist have different licenses and that a horticulturalist needs to be more knowledgeable about plants. R. at 33-34. He said that he would commonly lift 2,000 pound palm trees and that he would not lift less than a wheelbarrow of dirt weighing over 65 to 70 pounds. R. at 34-35. He would work on his knees to put in flowers and weed gardens. R. at 35. He would be on his feet all day long, taking only a 30 minute lunch break to sit down. R. at 36. If working a maintenance job, he would sit in the truck while driving between residences or commercial properties. Id.

Because he and his counsel had not been able to obtain medical records dated before his date last insured, [1] Mr. Martin provided extensive testimony about his past medical history. R. at 37- 53. He testified that he received injuries while playing sports in high school, college, and in the military. R. at 37. He has broken his neck, broken his nose five times, broken his shin, had nine

---

[1] According to Mr. Martin, Dr. Abbott, who performed the first three knee surgeries in the 1990s, had died making it "near impossible" to get his records and Baptist Hospital, where the knee surgeries were done, flooded. R. at 38-41. As to the critical time period, however, 2008-2010, Mr. Martin's counsel admits that "Mr. Martin was advised by Dr. Bourgeois' office that his records had been purged.  However, even if the records had been available, there would not have been any reports or documents that would have addressed Mr. Martin's disability status during the relevant period of time."  Rec. Doc. 19-1, p. 14. In his memorandum to the Appeals Council, Mr. Martin's counsel further wrote that following Hurricane Katrina in 2005, and despite experiencing a new onset of severe left leg and knee problems "he did not undergo formal medical treatment during this time." R. at 204.

broken fingers, and had titanium plates and non-screws in his right eye. Id. He testified that he has had 11 knee surgeries, two artificial knees, had his calf removed, and has been stabbed three times. R. at 38.

Mr. Martin testified that he injured his left knee while running down a hill in infantry training school in 1987. R. at 40. He was put in a soft cast, was put on light duty for three days, and was given aspirin. Id.  After that he was back in the field. Id.  Mr. Martin testified that in 1992, his left knee was crushed in 32 pieces while he was playing rugby. R. at 38, 41.  He was treated by Dr. Walter Abbott, who predicted he would never run again. R. at 38. But Mr. Martin rehabbed for five hours a day and ran again. Id.  Nonetheless, Dr. Abbott ended up having to remove the meniscus. Id.  At that point it was bone on bone and he had to have a third surgery. Id.

Mr. Martin met Dr. Bourgeois and his wife as landscaping clients. R. at 43.  Dr. Bourgeois asked why Mr. Martin was limping, and Mr. Martin testified that he explained to Dr. Bourgeois that he needed to get an artificial knee but he was waiting for a new knee to come out so he would only have to get one in his lifetime. R. at 39. Mr. Martin added that he was going through a divorce in 2008 and wanted to be able to make payments to his ex-wife. Id.

Mr. Martin testified that after the three surgeries, he had arthritis in his knee and was told by Dr. Abbott that he would need an artificial knee. R. at 42. But he returned to work, though with a noticeable limp and lots of pain.. R. at 43. He testified that he took everything from Celebrex to tramadol. Id.

During Hurricane Katrina, Mr. Martin's home flooded and when he was doing the gutting, he fell through the floor. R. at 44. He testified that this "brought on the pain big time." R. at 44. After that he says he was no longer able to perform work. R. at 44-45. In addition to his knee pain, he testified that he also had swelling in his legs due to hepatitis C. R. at 45. He testified that if he

worked hard one day, he could not work for a day and a half after that because his legs were swelling so badly. Id.  But he did not go to any doctors' offices to get treatment. Id.  He explained that he had physician customers and friends who gave him pain medication and encouraged him to "get the knee done." R. at 45-46. But knee surgery was not an option for him until he paid off his ex-wife and was recovered from Hurricane Katrina. R. at 46. He noted that Dr. Bourgeois tried to get him to come in on numerous occasions, but he was not ready. R. at 47.

His attorney asked him to describe his condition in 2008. Mr. Martin testified that he could no longer push the wheelbarrow or get on his knees to put in flowers. R. at 50. He said he would have to sit down. Id.  He testified that he could not put a sock on and had trouble going down the stairs. R. at 51.  Mr. Martin also said that if he tried to work, his legs would swell and he would elevate them and ice them and would be on crutches for two days. R. at 48. He testified that there came a point where he could not walk anymore, and that is when he got his knee done. R. at 48-49. Dr. Bourgeois put in the artificial knee in January 2013. R. at 51-52.

Vocational expert Kasey Crawford Suggs testified at the hearing. R. at 54. The vocational expert noted that the record indicated that Mr. Martin had done some sales at one time. R. at 56. Mr. Martin explained that "sales" or consulting regarding the use of certain plants was an aspect of his job as a horticulturalist. Id.

The vocational expert classified Mr. Martin's past work as: (1) landscape laborer, DOT 408.687-014, heavy, unskilled, SVP 2 and (2) horticulturalist, 040.061-038, medium, highly skilled, SVP 8. R. at 57. She found no transferable job skills. Id.

In response to a hypothetical posed by the ALJ, the vocational expert testified that if the claimant could perform medium work, then the horticulturalist work would still be available. Id. The ALJ asked the vocational expert to consider whether the claimant could work if he needed to

take at least four days off a month because he could not work due to the previous day's work and that during a workday he would need breaks totaling one hour. R. at 58. The vocational expert testified that there would be no jobs available. Id.

Mr. Martin's counsel did not have any questions or comments for the vocational expert. Id.

*Medical Records and Opinion Evidence*

Dr. Warren Bourgeois submitted a letter dated February 22, 2019.[2] R. at 19. He stated that he had known Mr. Martin since 2008 when he was responsible for a major relandscaping of his residential property and subsequently as a patient. Id. Dr. Bourgeois reported that it was obvious at his first encounter with Mr. Martin that he was struggling with posttraumatic arthritis of the left knee. Id. Dr. Bourgeois opined that Mr. Martin appeared to be limited in his ability to perform activities such as squatting, climbing, digging with a shovel, and prolonged standing and walking. Id. Dr. Bourgeois also stated that when Mr. Martin's "pain level became intolerable and his activity level further deteriorated, he elected to proceed with surgery in 2010." Id. Dr. Bourgeois opined that "based on my knowledge of his overall history, I believe he has been essentially disabled from performing the tasks and duties required of his occupation as a professional landscaper since at least 2008." R. at 20.

Medical records reflect that Mr. Martin presented for physical examination with Dr. Bourgeois on January 3, 2013. R. at 442-43. His chief complaint was pain in his left knee. Id. at

---

[2] At the hearing on February 26, 2019, the ALJ asked Mr. Martin's counsel to explain why the letter of Dr. Bourgeois had been provided only two business days prior to the hearing. R. at 26. Counsel explained that Mr. Martin's medical records from Dr. Bourgeois' medical practice had been purged. Dr. Bourgeois had retired and so they had to track him down to determine whether he would be willing to offer a written statement or opinion to the court. Counsel explained that they did not know Dr. Bourgeois was going to provide anything until the day they received the letter and they submitted it to the ALJ the same day. Counsel was unable to provide any evidence showing when counsel had first attempted to contact Dr. Bourgeois. The ALJ noted that counsel had been enrolled in the matter since April 2018. The ALJ also pointed out that Dr. Bourgeois stated that Mr. Martin elected to proceed with surgery in 2010, but the medical records showed that the surgery was performed in 2013. Counsel for Mr. Martin argued that this was a typographical error in the letter and that Mr. Martin did not contend that a surgery was performed in 2010.

443. It was noted that he had a history of advanced post-traumatic osteoarthritis and that NSAIDS were no help. Id. He requested a total knee arthroscopy for pain relief. Id. His gait was antalgic. R. at 442. He was diagnosed with degenerative joint disease of the left knee and obesity. Id.

Mr. Martin had a left total knee arthroplasty surgery performed by Dr. Bourgeois on January 8, 2013. R. at 445-46. He was discharged on January 11, 2013. R. at 439. Home health services and home CPM (continuous passive motion) were arranged as well as DME (durable medical equipment). Id.

Mr. Martin presented to the East Jefferson General Hospital ("EJGH") emergency department on October 25, 2013, with a fever and knee pain, including swelling, myalgias, and chills. R. at 400. He reported the pain in his left knee was throbbing. Id. He reported that two days earlier he began trying to improve his range of motion by doing some aggressive exercises on a bicycle and began having fever and chills the following day. R. at 388. He was placed on vancomycin and Rocephin. R. at 389. After numerous tests and scans, Dr. William Sherman determined he had an acute hematogenous left knee infection. R. at 405. An open irrigation debridement with linear exchange was scheduled. R. at 405. But his platelets were 66 and then dropped to 52. Dr. Sherman performed a left knee arthroscopic irrigation and debridement and left knee synovial biopsy on October 26, 2013. R. at 405.

Labs on October 28, 2013, showed thrombocytopenia with a macrocytic anemia and transaminitis. R. at 387. It was noted that he was scheduled for surgery to revise a prostatic joint associated with septic arthritis. Id. Because of a low platelet count a platelet transfusion prior to his surgery was recommended. Id. That same day Dr. Bourgeois performed an incision, drainage, irrigation, and debridement with polyethylene exchange of the left knee. R. at 403.

On October 31, 2013, Mr. Martin was diagnosed with Hepatitis C. R. at 384.

Mr. Martin returned to EJGH on November 10, 2013, with fever and chills on and off for the previous two weeks. R. at 359.  It was noted he had full range of motion in the left knee with no obvious swelling, redness, or increased warmth. R. at 360. His PICC line was removed and he was continued on vancomycin and piperacillin. Id. He was admitted for further management and evaluation. Id. The physicians considered the possibility of a drug fever that could cause neutropenia, so Zosyn and vancomycin were discontinued and he was initiated on daptomycin which resolved the fevers. R. at 338. After cultures of his PICC line came back negative a new PICC line was placed for outpatient antibiotics consisting of daptomycin. Id. He was discharged on November 14, 2013, with diagnoses of septic arthritis in prosthetic left knee; acute febrile illness, sepsis ruled out; possible drug fever; obesity; chronic hepatitis C; iron deficiency and B12 deficiency anemia; thrombocytopenia secondary to liver disease; hyponatremia; abnormal liver function tests; suspected sleep apnea; morbid obesity; left knee pain; and neutropenia likely due to Zosyn. R. at 337. It was discussed that he might still need removal of hardware. R. at 339.

On January 7, 2014, Dr. Bourgeois performed a removal of Mr. Martin's total knee arthroplasty components with interposition of an antibiotic cement spacer. R. at 307. Dr. Eric Ehrensing provided consultation after the surgery and recommended Mr. Martin be started on Cubican, to await cultures and adjust antibiotics as needed, and to follow his liver function because he was currently off therapy for Hepatitis C. R. at 305-06. Dr. Jonathan Cone provided consultation on January 8, 2014. R. at 301-04.

Mr. Martin presented to Dr. Chad Millett at Southern Orthopaedic Specialists on March 11, 2014 with complaints of pain and swelling in his left knee. R. at 584. He still had a static cement spacer in place and was wearing a knee brace. Id.  He had diffuse pain in his left knee on palpation and he ambulated with crutches. R. at 585-86. Dr. Millet evaluated Mr. Martin for a

possible knee revision surgery. R. at 584.  He concluded Mr. Martin had a very complex case. R. at 587. He noted that there was no evidence of an infecting organism or a history of metal allergies, but Mr. Martin would be seen the following week by an allergist. R. at 587. Dr. Millet also noted that he had concerns that if Mr. Martin had surgery, the skin might not come together because it was extremely scarred and he still had an opening distally. Id. Dr. Millet recommended he consult with a plastic surgeon about the possible use of tissue expanders and planned to discuss with Dr. Ehrensing about the infectious disease aspect. Id. He would see Mr. Martin again after the consultations. Id.

On April 18, 2014, Mr. Martin presented to Metropolitan Gastroenterology Associates. R. at 285. His gait was noted to be slow. R. at 286. A liver biopsy was performed on April 24, 2014. R. at 293.

Mr. Martin followed up with Dr. Millet on July 1, 2014. R. at 580. It was noted that he was starting a medication regimen for Hepatitis C the next week. Id.  A blood test would be obtained thereafter, and then Dr. Millet would determine when to remove his static spacer. Id.  It was noted Mr. Martin was taking metaxalone, lisinopril, hydrocodone-acetaminophen, zolpidem tart, oxycontin, and gabapentin. R. 581. He ambulated with crutches and had diffuse pain in his left knee on palpation. Id.  581-82.

Mr. Martin followed up with Dr. Millet on August 5, 2014, for his left knee. R. at 255. It was noted that he walks with crutches. R. at 257. His left knee had diffuse pain on palpation. Id.

On August 25, 2014, he had surgery at EJGH for implantation of an articulating spacer and soft tissue coverage with a medial gastrocnemius muscle flap. R. at 250, 259, 269-73. The surgery was performed by Dr. Thomas Sands and Dr. Millet. R. at 269-73. Mr. Martin was discharged on

August 30, 2014, with instructions to refrain from any bending of the knee and no weightbearing on the left leg. R. at 250-51.

Mr. Martin followed up with Dr. Millet on September 30, 2014. R. at 578. He was ambulating with crutches and was in a knee immobilizer. Id.

He followed up with Dr. Millet on October 28, 2014. R. at 574. Dr. Millet noted that Mr. Martin walked with a limp and that this left knee was not tender to palpation. R. at 575-56.  Dr. Millet noted Mr. Martin was ready to start physical therapy. R. at 574.  A second stage revision was planned for February. R. at 577.

Mr. Martin followed up with Dr. Millet on January 6, 2015. R. at 570. He walked with a limp but his left knee was not tender to palpation. R. at 571-72. An x-ray of the left knee was performed and showed the articulating cement spacer in good position. R.at 572. Dr. Millet scheduled Mr. Martin for a left total knee revision at Baptist Hospital on February 6, 2015, at which time the cement spacer would be removed and he would be converted to a Zimmer LCCK prosthesis. R. at 573.

Mr. Martin returned to Dr. Millet on January 15, 2015, to follow up for his left knee. R. at 223. It was noted that he had been going to therapy. Id.  Dr. Mr. Martin walked with a limp, but his knee was not tender to palpation. R. at 224.

The operation was performed jointly by Dr. Sands and Dr. Millet on February 4, 2015. R. at 232-36. Dr. Sands performed the elevation and revision of previous left lower extremity, medial gastrocnemius muscle flap with complex closure and Dr. Millet performed the left total knee revision. Id. Mr. Martin was discharged from EJGH on February 7, 2015, with diagnoses of acute kidney injury; anemia, B12 deficiency; anemia, Iron deficiency, Cirrhosis, hepatitis C;

hypertension; hypo-osmolality and/or hyponatremia; non-alcoholic fatty liver disease; septic joint of left knee joint.  R. at 219.

Mr. Martin followed up with Dr. Carmen Sanchez on February 14, 2015, for post op. R. at 228. His pain was adequately controlled. Id.

Mr. Martin followed up with Dr. Millet on February 19, 2015. R. at 566. He was ambulating with one crutch and his knee was not tender to palpation. R. at 567. Dr. Millet noted that he wanted to put Mr. Martin in physical therapy as soon as possible. R. at 568.

Mr. Martin followed up with Dr. Millet on March 19, 2015. R. at 564. He was walking with a cane and doing well. R. at 564. Mr. Martin would continue physical therapy. Id.

Mr. Martin followed up with Dr. Millet on May 21, 2015. R. at 560. His range of motion was -5 to 80 degrees, but he reported that he has gotten up to 90 degrees in physical therapy. Id. Imaging showed the Zimmer LCCK total knee revision in good position with no evidence of loosening. Id. Mr. Martin would continue physical therapy. Id.

On March 21, 2018, state agency examiner Dr. Forrest Wright reviewed Mr. Martin's medical records and determined that "[t]here were no treatments done for impairments within the relevant time period. Therefore, there is insufficient evidence to properly process the claim. Disability cannot be established." R. at 67.

### Decision of the Administrative Law Judge

First, the ALJ considered whether to admit a statement by Dr. Warren Bourgeois dated February 22, 2019, and submitted two business days before the hearing. Finding the submission untimely, the ALJ declined to admit the evidence because the date of the surgery noted in the letter was incorrect making the letter unreliable and because there was no medical evidence attached to the letter to support the statements made therein.

The ALJ then turned to the question of whether Mr. Martin had established a disability as defined by the Act prior to or on his date last insured ("DLI"). The ALJ determined that Mr. Martin last met the insured status requirements of the Act on December 31, 2010. The ALJ further determined that Mr. Martin did not engage in substantial gainful activity during the period from his amended alleged onset date of September 8, 2008 though his DLI of December 31, 2010.

The ALJ next determined that through his DLI, Mr. Martin had the following severe impairments: osteoarthrosis, other and unspecified arthropathies; and hepatitis C. But the ALJ determined that through his DLI, Mr. Martin did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ further determined that through Mr. Martin's DLI, he had the residual functional capacity to perform the full range of medium work. The ALJ then determined that through the DLI, Mr. Martin was capable of performing his past relevant work as a horticulturist because this work did not require the performance of work-related activities precluded by his residual functional capacity. Finally, the ALJ concluded that Mr. Martin was not under a disability as defined in the Act at any time from September 8, 2008, the alleged onset date through December 31, 2010, the DLI.

## Statement of Issues on Appeal

Issue No. 1.    Whether the ALJ erred in refusing to admit the medical opinion of Dr. Bourgeois.

Issue No. 2.    Whether the ALJ's determination that Mr. Martin did not have severe impairments that met any of the listed impairments in 20 C.F.R. Part 404, Appendix 1, Subpart P is supported by substantial evidence.

Issue No. 3    Whether the ALJ's determination that Mr. Martin had the residual functional capacity to perform the full range of medium work through his date last insured is supported by substantial evidence.

Issue No. 4    Whether the ALJ's determination that Mr. Martin is able to perform his past relevant work is supported by substantial evidence.

Issue No. 5      Whether the ALJ erred in finding that Mr. Martin was not under a disability as defined by the Act as of his alleged disability onset date of September 8, 2008.


## Analysis

### I.  Standard of Review.

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005).  Substantial evidence is more than "a mere scintilla," but less than a preponderance.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Hames v. Heckler, 707 F.2d 162, 164 (5th Cir. 1983). "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (quoting Consol. Edison Co. of New York v. N.L.R.B., 305 U.S. 197, 229 (1938)).  This court may not re-weigh the evidence, try the issues *de novo*, or substitute its judgment for the Commissioner's.  Perez, 415 F.3d at 461.

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91, 113 (1992).  Despite this Court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

## II.    <u>Entitlement to Benefits under the Act.</u>

To be considered disabled under the Act, a claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Pursuant to the regulations promulgated under the Act, the Commissioner engages in a five-step sequential evaluation process to determine whether an individual qualifies as disabled. <u>See</u> 20 C.F.R. § 404.1520(a)(4). At each step, if the Commissioner determines that an individual is or is not disabled (depending on the step), her decision is made on that basis and she does not proceed to the next step. <u>Id.</u> Following these same five steps, the ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity (whether the claimant is working); (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R., Part 404, Subpart B, Appendix 1; (4) whether the impairment prevents the claimant from doing past relevant work (whether the claimant can return to his old job); and (5) whether the impairment prevents the claimant from doing any other work.

<u>Perez</u>, 415 F.3d at 461. The burden of proof is on the claimant in steps one through four, and then at step five, the Commissioner must "show that the claimant can perform other substantial work in the national economy." <u>Id.</u> Once the Commissioner has made this showing, the claimant bears the burden to rebut the finding. <u>Id.</u>  An assessment of the claimant's residual functional capacity is used in steps four and five to determine the claimant's ability to perform his past work or any other type of work. <u>Id.</u>

## III.    <u>Plaintiff's Appeal</u>.

*Issue No. 1.    Whether the ALJ erred in refusing to admit the medical opinion of Dr. Bourgeois.*

The regulations require that a claimant "must make every effort to ensure that the administrative law judge receives all of the evidence and must inform [the ALJ] about or submit any written evidence . . . no later than 5 business days before the date of the scheduled hearing." 20 C.F.R. § 404.935(a). If a claimant fails to meet this deadline, the regulations provide that ALJ may decline to consider the evidence unless the ALJ has not yet issued a decision and the reason the claimant did not provide the evidence earlier is because:

> (1) Our action misled you;
> (2) You had a physical, mental, educational, or linguistic limitation(s) that prevented you from informing us about or submitting the evidence earlier; or
> (3) Some other unusual, unexpected, or unavoidable circumstance beyond your control prevented you from informing us about or submitting the evidence earlier. Examples include, but are not limited to:
> > (i) You were seriously ill, and your illness prevented you from contacting us in person, in writing, or through a friend, relative, or other person;
> > (ii) There was a death or serious illness in your immediate family;
> > (iii) Important records were destroyed or damaged by fire or other accidental cause; or
> > (iv) You actively and diligently sought evidence from a source and the evidence was not received or was received less than 5 business days prior to the hearing.

Id. § 404.935(a)-(b).

Mr. Martin argues that the ALJ should have considered the letter of Dr. Bourgeois because an "unusual, unexpected, or unavoidable circumstance" beyond his control prevented him from submitting the information earlier. Mr. Martin explains that because Dr. Bourgeois no longer actively practices medicine, Mr. Martin had to seek him out in order to request he issue a narrative report. Dr. Bourgeois provided his report to Mr. Martin on February 22, 2019, and Mr. Martin submitted it to the Social Security Administration the same day. He argues that he could not have submitted this report sooner because it did not exist prior to that time. With regard to the absence of office records in support of the report, Mr. Martin submits that he was advised by Dr. Bourgeois' office that his records had been purged. In any event, Mr. Martin acknowledges that he did not

treat with Dr. Bourgeois until 2012, so there are no medical records dated before December 31, 2012. He argues that as a result of the lack of medical records, Dr. Bourgeois' report is critical to his claim. With regard to Dr. Bourgeois' reference to surgery in 2010, Mr. Martin submits that this is a typographical error that does not render the entire report unreliable. Mr. Martin argues that the ALJ had time to consider this record because it was submitted more than a month prior to the ALJ's decision. He argues that the ALJ failed to follow the regulations by refusing to admit the opinion of Dr. Bourgeois.

The Commissioner opposes, pointing out that Mr. Martin's counsel enrolled in April 2018 and that on November 8, 2018, Mr. Martin was notified that he was required to submit all evidence or notify the ALJ about additional evidence no later than 5 business days before the date of his hearing. R. at 101. The Commissioner argues that a treating physician's opinion is only given controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. The Commissioner argues that no such evidence exists because Dr. Bourgeois did not treat Mr. Martin until 2012. The Commissioner also cites the new regulations regarding consideration of medical sources and argues that the report of Dr. Bourgeois is not reliable or supported by medical evidence. The Commissioner argues that because there is no objective evidence to support Dr. Bourgeois' conclusions regarding Mr. Martin's condition during the relevant period, the ALJ was free to reject Dr. Bourgeois' letter. The Commissioner also argues that Dr. Bourgeois' statement that Mr. Martin was disabled from performing his duties as a landscaper does not amount to a medical opinion because it does not provide an opinion about his functional abilities and limitations. The Commissioner argues that Dr. Bourgeois could not provide an opinion about Mr. Martin's condition during the relevant period because he did not treat Mr. Martin at that time.

Further, the Commissioner argues that Mr. Martin does not meet any of the exceptions to allow consideration of the late submitted evidence. The Commissioner argues that Mr. Martin can only succeed on a claim that remand is appropriate where the new evidence is non-cumulative, is material, and there is good cause for his failure to submit it at the administrative level. The Commissioner argues that the Bourgeois letter is not material because Mr. Martin cannot establish that it would have changed the ALJ's decision.

The cases cited by the Commissioner that require materiality and good cause before new evidence can be considered on appeal involve cases where evidence is submitted after the ALJ's decision. Leggett v. Chater, 67 F.3d 558, 567 (5th Cir. 1995) (new evidence consisted of two psychiatric evaluations obtained after the claimant had initiated his judicial appeal of the Commissioner's denial of benefits); Bradley v. Bowen, 809 F.2d 1054, 1056 (5th Cir. 1987) (new evidence consisted of a letter of an orthopedic surgeon issued over a year after the claimant sought judicial review of the Commissioner's decision denying benefits). In contrast, the evidence here was submitted to the ALJ with sufficient time for the ALJ to consider it, had it been proper for the ALJ to do so. See Long v. Comm'r of Soc. Sec., No. 1:20-CV-1490, 2021 WL 2530216, at *3 (N.D. Ohio June 21, 2021) (rejecting application of the good cause standard for consideration of new evidence on appeal where the evidence at issue was submitted before the ALJ's decision). The Commissioner fails to show any legal support for applying the good cause standard described by the court in Leggett in a situation like the present.

Some courts have applied an abuse of discretion standard in reviewing the ALJ's decision to exclude evidence under 20 C.F.R. § 404.935. E.g., Cassel v. Kijakazi, No. 4:20-CV-00703-YK-GBC, 2021 WL 3463906, at *5 (M.D. Pa. Aug. 6, 2021); Michael S. v. Comm'r of Soc. Sec., No. 19-CV-00095, 2021 WL 3270508, at *4 (W.D.N.Y. July 30, 2021). Other courts do not address a

standard of review and simply agree or disagree with the ALJ's ruling. DeGraff v. Comm'r of Soc. Sec., 850 F. App'x 130, 132 (2d Cir. 2021) (unpublished) (holding that the five day rule only required claimant to inform the ALJ of the records' existence and finding that the claimant's submission of some records before the deadline informed the ALJ of the extent of his treatment at Hillside and revealed a clear evidentiary gap and that the claimant had thereby met this requirement and the ALJ should have considered the records or explained why they would not have changed his decision); Whitten v. Saul, No. CV 20-1778, 2021 WL 2803102, at *4-5 (E.D. La. July 6, 2021) (holding that the ALJ did not err in excluding 100 pages of medical records that plaintiff gave to his lawyer but that got stuck in the envelope and were not timely submitted to the ALJ by his lawyer); Delpizzo v. Saul, No. 3:19-CV-21105, 2021 WL 2651949, at *16 (D.N.J. June 28, 2021) (finding no error in the ALJ's decision to exclude medical records submitted two days before the hearing where the claimant's attorney had not requested the records until two months before the hearing and explained that her office's policy was not to request records until the hearing was scheduled and also explained that a reason for the delay in obtaining the records was that the doctor was out most of the summer); Long v. Comm'r of Soc. Sec., No. 1:20-CV-1490, 2021 WL 2530216, at *5 (N.D. Ohio June 21, 2021) (finding that the claimant had acted diligently in trying to obtain the medical records where the claimant requested the records on the same day as treatment, asked the custodian to rush delivery, did not receive the records until after the hearing, and submitted them the next day which was still before the ALJ's decision submitted them after the hearing but before the ALJ's decision and that the failure to consider the records was not a harmless error).

Here, the court finds that the ALJ did not abuse abused his discretion in refusing to admit the opinion evidence of Dr. Bourgeois. Importantly, Mr. Martin's attorney could not say when the

records had first been sought from Dr. Bourgeois. While tracking down a retired doctor whose medical records have been purged certainly presents a challenge, this does not amount to a free pass. Mr. Martin and his counsel had to make some showing that they actively and diligently sought the evidence.

Moreover, even if Dr. Bourgeois' letter should have been considered by the ALJ, the court finds that the ALJ's failure to do so is a harmless error. Indeed, although the ALJ determined that §404.935(b) did not apply, the ALJ also found that the opinion was unreliable because Dr. Bourgeois erroneously referenced 2010 as the date of Mr. Martin's surgery and because no medical evidence was attached to the opinion. Mr. Martin describes the date reference as a typographical error, but there is no evidence to support this theory. It might have been a typographical error or Dr. Bourgeois might not have accurately remembered the date of Mr. Martin's surgery. If the latter, it calls into question whether Dr. Bourgeois accurately remembered Mr. Martin's condition in 2008. While other conclusions may have been possible, the ALJ's determination that the date error made Dr. Bourgeois' opinion unreliable is supported by substantial evidence.

Further, in evaluating a medical opinion, the regulations instruct that the most important factors to consider are the supportability (i.e., relevant objective medical evidence and supporting explanations presented to support the opinion) and consistency (i.e., consistent with evidence from other medical and nonmedical sources) of the opinion. 20 C.F.R. §404.1520c. Other factors an ALJ considers are the relationship of the physician with the claimant, the length of the treatment relationship, the frequency of the examination, the purpose of the treatment relationship, the extent of the treatment relationship, whether there was an examining relationship, and the medical source's specialization. Id. Although Dr. Bourgeois has a relevant specialization and treated Mr. Martin, there is no dispute that Dr. Bourgeois did not treat Mr. Martin before his DLI and that

there are no contemporaneous medical records to support any of the opinions Dr. Bourgeois expresses in his medical records. The court finds that the lack of supporting medical records and the error in the surgery date provide substantial evidence for the ALJ to discount Dr. Bourgeois' opinion and deem it unreliable. Thus, even if the ALJ should have admitted the letter into evidence, the ALJ's failure to do so was harmless error. And accordingly, the court finds no error in the ALJ's decision to exclude the letter.

Issue No. 2.    *Whether the ALJ's determination that Mr. Martin did not have severe impairments that met any of the listed impairments in 20 C.F.R. Part 404, Appendix 1, Subpart P is supported by substantial evidence.*

The impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 describe "the major body systems impairments" that the Social Security Administration considers "to be severe enough to prevent an individual from doing *any gainful activity*, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a) (emphasis added). "If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled." Bowen v. Yuckert, 482 U.S. 137, 141 (1987). The criteria for the listed impairments are more severe than the statutory standard. Sullivan v. Zebley, 493 U.S. 521, 532 (1990).   "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." Id. at 530. "For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." Id. at 531.

Mr. Martin argues that his impairments meet or equal the criteria set forth in listing 1.02 in Appendix 1, Subpart P. This criteria of this listing are as follows:

gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation

of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. pt. 404, app. 1, § 1.02(A). Mr. Martin relies primarily on the report of Dr. Bourgeois to support his claim that his impairments reached this level of severity prior to his DLI. But he also cites Dr. Bourgeois' discharge summary notes on January 11, 2013, which provides that Mr. Martin had "advanced, painful, activity-limiting osteoarthritis of the left knee secondary to trauma approximately 30 years ago." R. at 439.

As determined above, however, the ALJ did not err in determining the letter of Dr. Bourgeois was unreliable. The court finds that Dr. Bourgeois' notes in January 2013 are not sufficiently specific to support finding that Mr. Martin's impairments met the listed criteria more than two years earlier prior to December 31, 2010. And as the Commissioner points out, Mr. Martin did not seek treatment from a physician or the Veteran's Administration prior to 2012. In determining that Mr. Martin's impairments did not meet or medically equal a listed impairment, the ALJ found there were no medical findings in the record to support such a finding. The ALJ's conclusion is supported by substantial evidence and must be affirmed.

*Issue No. 3    Whether the ALJ's determination that Mr. Martin had the residual functional capacity to perform the full range of medium work through his date last insured is supported by substantial evidence.*

The regulations provide that medium work "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c). Social Security Ruling 83-10 further provides that "[a] full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday

in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds." SSR 83-10, 1983 SSR LEXIS 30.

Mr. Martin argues that his medical records and testimony clearly establish that he is incapable of performing work that falls within the medium category due to the limitations created by his left leg and knee difficulties. He argues that the ALJ ignored his extensive hearing testimony and the medical evidence documenting his medical condition and that, therefore, the ALJ's determination of his residual functional capacity is not supported by substantial evidence.

As the Commissioner points out, the ALJ determined Mr. Martin's medically determinable impairments could reasonably be expected to cause the alleged symptoms but that his statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. The ALJ considered that Dr. Wright, the state agency medical consultant, found that although Mr. Martin was having problems with his left knee, hepatitis C, and arthritis of the right knee, there was insufficient evidence to evaluate Mr. Martin's case prior to December 31, 2010. The ALJ found Dr. Wright highly persuasive. The ALJ observed that there were no medical records from the relevant period and that despite Mr. Martin's testimony that he had many doctors as clients who told him he needed knee surgery, he did nothing about their recommendations until seeking treatment in late 2012. The ALJ noted that Mr. Martin had served in the Marine Corps and admitted that he could have received care from Veteran's Affairs. The court finds the ALJ's determination of Mr. Martin's residual functional capacity is supported by substantial evidence.

*Issue No. 4    Whether the ALJ's determination that Mr. Martin is able to perform his past relevant work is supported by substantial evidence.*

Mr. Martin argues that there is no evidence to show that he worked solely as a horticulturalist and that, therefore, the position should not be considered on its own for purposes of past relevant work. Instead, Mr. Martin argues that the ALJ should only consider Mr. Martin's past experience as a horticulturist in concert with his work as a landscaper, which would classify the position as heavy labor.

The Commissioner argues that the ALJ properly relied on the testimony of the vocational expert in determining that Mr. Martin could perform his past relevant work. The court agrees.

> The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed. A vocational expert is able to compare all the unique requirements of a specified job with the particular ailments a claimant suffers in order to reach a reasoned conclusion whether the claimant can perform the specific job.

Fields v. Bowen, 805 F.2d 1168, 1170 (5th Cir. 1986). The Social Security Administration instructs that:

> composite jobs have significant elements of two or more occupations and, as such, have no counterpart in the DOT. Such situations will be evaluated according to the particular facts of each individual case. For those instances where available documentation and vocational resource material are not sufficient to determine how a particular job is usually performed, it may be necessary to utilize the services of a vocational specialist or vocational expert.

SSR 82-61, 1982 WL 31387 (1982). In Palacios v. Saul, the claimant argued that "his past work was improperly characterized as a warehouse supervisor under the DOT (Dictionary of Occupational Titles) when it should have been considered a 'composite' job." 2020 WL 7232901, at *11 (S.D. Tex. Nov. 2, 2020), report and recommendation adopted, No. CV H-19-4024, 2020 WL 7232076 (S.D. Tex. Dec. 4, 2020). As a composite job, the claimant argued that the ALJ should have considered the job as it was actually performed. Id.  Noting that it was the claimant's burden to show he could not perform his past relevant work, the district court found that the claimant had waived any argument relative to whether his past work should have been classified

as a composite job because although represented by counsel at the hearing, he had not made any challenge to the vocational expert's characterization of his past work. Id.  Further, the court found that both the ALJ and the vocational expert had considered all aspects of the claimant's past work in determining that it fell within the definition of a warehouse supervisor under the DOT. Id.  at *12. The court found the ALJ did not err in determining that the claimant could perform his past relevant work as a warehouse supervisor as that work is generally performed in the national economy. Id.

Similarly here, Mr. Martin's counsel did not object to the vocational expert's classification of his past relevant work at the hearing despite having an opportunity to do so. The vocational expert considered Mr. Martin's testimony regarding the work he performed and identified two occupations with DOT counterparts. The vocational expert considered the hypothetical posed by the ALJ and determined that a person like Mr. Martin who was limited to medium work could perform his past relevant work as a horticulturist. Relying on this testimony, the ALJ found that if Mr. Martin was limited to performing medium work, he would be able to perform his past work as a horticulturalist. The court finds substantial evidence supports the ALJ's determination.

*Issue No. 5    Whether the ALJ erred in finding that Mr. Martin was not under a disability as defined by the Act as of his alleged disability onset date of September 8, 2008.*

Relying on the arguments asserted above, Mr. Martin argues that the ALJ's conclusion that he was not under a disability as defined in the Act as of September 8, 2008, is not supported by substantial evidence. He points out that the vocational expert testified that if Mr. Martin needed to take additional breaks, take four days off per month when unable to work because of the previous

day's activity, and take daily breaks totaling one hour, no jobs existed that he could perform. He argues that these are the exceptions and accommodations that he would require.

As discussed above in addressing each of Mr. Martin's arguments, the court has found that substantial evidence supports the ALJ's findings. Although the ALJ asked the vocational expert to consider additional limitations and accommodations, the ALJ ultimately determined that during the relevant period, Mr. Martin did not require those limitations. As discussed above, this conclusion was based upon the lack of medical evidence to support finding Mr. Martin was further limited by his impairments prior to December 31, 2010. The court finds that the ALJ's conclusion that Mr. Martin was not disabled from September 8, 2008, through December 31, 2010, is supported by substantial evidence and must be affirmed.

## **RECOMMENDATION**

Accordingly, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 19) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 25) be GRANTED.

## **OBJECTIONS**

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will

result from a failure to object.  <u>Douglass v. United Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th

Cir. 1996) (*en banc*).

 New Orleans, Louisiana, this 13th day of September, 2021.


Janis van Meerveld
United States Magistrate Judge
